EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Luis Oliver Canabal<br><br>    Demandante-Peticionario<br><br>              v.<br><br>Comisión Estatal de Elecciones<br><br>    Demandado-Recurrido | Certificación<br><br>2004 TSPR 112<br><br> 161 DPR \_\_\_\_ |

Número del Caso: CT-2003-4

Fecha: 30 de junio de 2004

Abogados de la Parte Peticionaria:

                    Lcdo. Pedro E. Ortiz Álvarez
                    Lcda. Lourdes María Torres Esteves
                    Lcdo. Héctor Luis Acevedo
                    Lcda. Mónica I. De Jesús Santana
                    Lcdo. Alejandro García Padilla

Abogado de la Parte Recurrida:

                    Lcdo. Pedro A. Delgado Hernández

Abogado del Comisionado Electoral del Partido Nuevo
Progresista:

                    Lcdo. Luis F. Estrella Martínez


Materia: Revisión Judicial de Resolución de la Comisión  Estatal
         de Elecciones


Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correcciones del proceso
de compilación y publicación oficial de las decisiones del
Tribunal. Su distribución electrónica se hace como un servicio
público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis Oliver  Canabal

    Demandante Peticionario

        v.                              CT-2003-4

Comisión Estatal de Elecciones

    Demandado Recurrido

SENTENCIA

San Juan, Puerto Rico, a 30 de junio de 2004.

El honorable Luis Oliver Canabal, Alcalde del Municipio de Lares, presentó el 1 de agosto de 2003 ante la Unidad de Radicaciones de la Comisión Estatal de Elecciones (de ahora en adelante CEE) la candidatura para su reelección a dicha posición por el Partido Popular Democrático (de ahora en adelante P.P.D). No se presentó ante la CEE ningún estado de situación revisado por un Contador Público Autorizado. Tampoco fue presentada copia certificada del Informe Financiero sometido ante la  Oficina de

Ética Gubernamental (de ahora en adelante O.E.G.), correspondiente al año 2002. No había en el expediente ante la CEE ningún documento que informara sobre la situación financiera del señor Oliver Canabal. Este último presentó en la Oficina de Radicaciones del PPD, antes del 1 de agosto de 2003, una declaración jurada que contenía información sobre su situación financiera.

El Presidente de la CEE emitió Resolución el 10 de octubre de 2003, notificada a las partes ese mismo día, en vista de que los tres (3) Comisionados Electorales no estaban de acuerdo en forma unánime sobre la forma de resolver la disputa. Determinó que al no cumplir con los requisitos de ley el honorable Luis Oliver Canabal no podía ser certificado como candidato al cargo de Alcalde por el Municipio de Lares y que el PPD podía someter un candidato sustituto para dicho cargo, siempre y cuando no fuera la misma persona.

El 20 de octubre de 2003 fue presentado por el honorable Luis Oliver Canabal ante el Tribunal Primera Instancia, Sala Superior de San Juan, recurso para la revisión de la Resolución emitida por el Presidente de la CEE. El PPD hizo lo propio ese mismo día. Después de presentados todos los alegatos de las partes el foro primario emitió Sentencia revocando la Resolución recurrida. Resolvió que era procedente la certificación del honorable Luis Oliver Canabal como aspirante al cargo de Alcalde del Municipio de Lares por el PPD. Entendió que el aspirante había sometido a la Oficina de Radicaciones de

Candidaturas del PPD un estado financiero bajo juramento que contiene sustancial y esencialmente la misma información que surge del Informe Financiero de 2002, presentado por el aspirante ante la OEG el 8 de agosto de 2003 a las 4:09 de la tarde.

Inconforme con lo resuelto por el TPI el 26 de noviembre de 2003 recurrió mediante Certiorari ante el Tribunal de Apelaciones el Comisionado Electoral del Partido Nuevo Progresista. La CEE también recurrió al Tribunal de Apelaciones solicitando la revisión de la Sentencia dictada por el Tribunal de Primera Instancia. Pendientes ante el foro intermedio apelativo los recursos antes indicados se presentó ante esta Curia recurso de certificación por las partes recurridas ante el Tribunal de Apelaciones. Expedimos el auto de certificación solicitado.

Se confirma la Sentencia emitida por el Tribunal de Primera Instancia.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton emitió opinión concurrente a la cual se unieron la Jueza Presidenta señora Naveira Merly y el Juez Asociado señor
Fuster Berlingeri. El Juez Asociado señor Rivera Pérez

emitió opinión concurrente a la cual se unieron los Jueces Asociados señor Rebollo López y señor Corrada del Río. La Jueza Asociada señora Fiol Matta inhibida.


                              Patricia Otón Olivieri
                         Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis Oliver Canabal

   Demandante Peticionario

      v.

                                   CT-2003-4

Comisión Estatal de Elecciones

   Demandado Recurrido

Opinión Concurrente emitida por el Juez Asociado señor Hernández Denton a la cual se unen la Jueza Presidenta señora Naveira Merly y el Juez Asociado señor Fuster Berlingeri

San Juan, Puerto Rico, a 30 de junio de 2004.

Por estimar que la sentencia del Tribunal de Primera Instancia es esencialmente correcta y que cualquier otra interpretación del Art. 4.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3001 y ss (en adelante Ley Electoral), sería sumamente restrictiva y contraria al espíritu de dicha ley, suscribimos esta Opinión Concurrente.

I

El 10 de octubre de 2003, la Comisión Estatal de Elecciones (en adelante la CEE), emitió una resolución mediante la cual dictaminó que procedía la descalificación del señor Oliver Canabal como aspirante a la Alcaldía del

Municipio de Lares por el Partido Popular Democrático, por lo que declaró vacante dicha candidatura. El Presidente de la CEE basó su determinación en que para el 1 de agosto de 2003, el señor Oliver Canabal alegadamente no había presentado un estado financiero revisado o una copia del estado financiero jurado que se presentó ante la Oficina de Ética Gubernamental (en adelante OEG), según requiere el Art. 4.001 de la Ley Electoral de Puerto Rico, *supra*.

El señor Oliver Canabal acudió prontamente al Tribunal de Primera Instancia solicitando la revocación de dicho dictamen. Por su parte, dicho foro declaró con lugar las solicitudes de revisión y ordenó a la CEE que certificara la candidatura del señor Oliver Canabal para el cargo de Alcalde de Lares en representación del Partido Popular Democrático. El foro de instancia señaló, esencialmente, que el requisito de la Ley Electoral quedó cumplimentado oportunamente al señor Oliver Canabal presentar un estado financiero jurado ante la Oficina de Radicaciones del Partido Popular Democrático antes del 1ro de agosto de 2003, debido a que dicho documento contiene sustancialmente la misma información y forma que el documento que se somete ante la OEG. Desde el punto de vista jurídico, el Tribunal de Primera Instancia concluyó que el Art. 4.001 de la Ley Electoral quedó satisfecho y que dicha disposición debe interpretarse de forma compatible con los valores constitucionales que se verían afectados con la interpretación restrictiva propuesta por la CEE y el Partido Nuevo Progresista.

Inconformes con dicha determinación, la CEE y el Partido Nuevo Progresista acudieron ante el Tribunal de Apelaciones y solicitaron la revisión de la sentencia del foro de instancia. Aún pendiente el recurso ante el foro intermedio, el señor Oliver Canabal y el Partido Popular Democrático acudieron ante esta Curia mediante un recurso de certificación, conforme el Art. 3.002 (e) de la Ley de la Judicatura de 2003, Ley Núm. 201 de 22 de agosto de 2003. El 20 de febrero de 2004 expedimos el auto solicitado. Veamos los hechos particulares de este caso.

## II

El 19 de julio de 2003, el señor Oliver Canabal presentó ante la Oficina de Radicaciones del Partido Popular Democrático los documentos requeridos para aspirar al cargo de Alcalde por el municipio de Lares. El 31 de julio de ese año el Partido Popular Democrático certificó que la parte recurrente había cumplido con todos los requisitos de la Ley Electoral, *supra*, la Reglamentación de la CEE y el Reglamento del Partido Popular Democrático. Cabe destacar que en el momento en que el señor Oliver Canabal presentó su candidatura sometió un estado financiero juramentado al 31 de diciembre del 2002.

Posteriormente, el Comisionado Electoral del Partido Nuevo Progresista impugnó la certificación aduciendo que para la fecha límite del 1ro de agosto de 2003, el señor Oliver Canabal no había presentado un estado financiero revisado o copia del informe presentado por él ante la OEG. Aunque el peticionario estimó que el estado financiero juramentado que

presentó con su candidatura era sustancialmente igual en contenido y forma a aquél que presentó ante la OEG, en vista de la reclamación del Comisionado Electoral del Partido Nuevo Progresista, gestionó una copia certificada del estado financiero que había remitido a la OEG para presentarlo a la CEE. Debemos mencionar que el 23 de julio de 2003, el señor Oliver Canabal había solicitado una copia de dicho estado financiero a la OEG, la cual recibió el 7 de agosto de 2003.

Con este trasfondo fáctico en mente, veamos más a fondo las disposiciones de la Ley Electoral.

### III

La Ley Electoral considera un requisito fundamental para aspirar a la candidatura de un cargo electivo, la presentación de una petición de candidatura antes del primero de agosto del año que antecede las elecciones generales. 16 L.P.R.A. 3158(a). La falta de presentación de una candidatura dentro del dicho término constituye razón suficiente para que no sea aceptada la petición en cuestión.

Si más de una persona interesa aspirar al mismo puesto, surge la necesidad de cumplir con otra exigencia de ley, a saber, la obtención y presentación de un número específico de peticiones de endosos. 16 L.P.R.A 3158(a) y 3159. Si un candidato particular no cuenta con los endosos requeridos, la viabilidad de su aspiración queda obstaculizada y no puede ser considerada favorablemente por incumplimiento con los estatutos que rigen el proceso electoral. Grillasca v. CEE, 121 D.P.R. 186 (1988); Escalona v. CEE, 115 D.P.R. 529, 532 (1984). Por otro lado, cuando sólo existe un candidato, la ley

hace un reconocimiento implícito de que ese aspirante disfruta del apoyo de su partido, por lo que no se requiere la presentación de endosos. 16 L.P.R.A. 3156(b). Estos requisitos, cuyo cumplimiento se requiere por ley en determinada fecha, son de tal envergadura que su incumplimiento en la fecha dispuesta constituye un defecto fatal. Por ello, los mismos se conforman en requisitos *constitutivos* para la aspiración a la candidatura para un puesto electivo.[1]

La Ley Electoral exige además otra serie de documentos para dar por sometida la petición del candidato, a saber, planillas sobre contribución sobre ingresos, un estado financiero y certificaciones negativas de deudas contributivas. 16 L.P.R.A. 3151. La Ley Electoral no requiere que las copias de las planillas de contribución sobre ingresos se presenten junto a la petición de candidatura; bastará presentar evidencia de que los documentos se han solicitado al Departamento de Hacienda. 16 L.P.R.A. 3151. Es evidente pues, que el Art. 4.001 de la Ley Electoral, *supra*, no requiere que se presenten todos los documentos al momento de presentar la candidatura.

Los requisitos estatutarios que exigen presentar copia de las planillas sobre ingresos, certificación negativa de deuda contributiva y un estado financiero, sólo tienen el propósito de informar al público la situación económica del candidato previo a ocupar el puesto electivo y de establecer

---

[1] Es menester señalar que existen otros requisitos constitutivos para ocupar el puesto de Alcalde. Véase la Ley

que el candidato ha cumplido con sus responsabilidades según dispuestas en otros estatutos. Una vez se hayan sometido los documentos requeridos por el Art. 4.001, se procederá a evaluar los mismos para la eventual certificación del candidato. Nótese, que las exigencias del Art. 4.001 de la Ley Electoral conforman un requisito *calificativo* para el candidato*,* sin el cual no puede ser evaluada su petición. El término para presentar dichos documentos, no obstante, no es jurisdiccional. Tan es así, que el 31 de julio del 2003, la CEE emitió una resolución extendiendo el término para la presentación de las planillas de contribución sobre ingresos y el CRIM. Así, es errónea la interpretación de la CEE y de la Opinión concurrente del Juez Asociado señor Rivera Pérez a los efectos de que no presentar uno de los documentos requeridos por la Ley Electoral al momento de presentar una candidatura acarrea la descalificación automática como candidato. No obstante, esa no es la situación particular del caso de autos.

Es sumamente significativo para la solución del presente caso, el hecho de que el señor Oliver Canabal presentó un estado financiero juramentado el 19 de julio de 2003 ante la Oficina de Radicaciones del Partido Popular Democrático. En su Estado de Situación el señor Oliver Canabal declaró, en lo pertinente, que el Estado Financiero reflejaba su situación económica al 31 de diciembre de 2002. En dicho documento consta un desglose de los activos, pasivos, capital neto, ingresos, gastos e ingreso neto del señor Oliver Canabal. Ese Estado de

---

de Municipios Autónomos, Art. 3.001 de la Ley de la Ley Núm.

Situación juramentado <u>constaba en el expediente del candidato, y estuvo ahí desde antes del 1ro de agosto de 2003.</u> Es decir, la información financiera que se requería del aspirante, constaba en su expediente desde antes del 1ro de agosto de 2003.

Debemos recalcar además, <u>que el señor Oliver Canabal solicitó, desde el 23 de julio de 2003, copia del informe financiero que había presentado ante la OEG.</u> La OEG reconoce que lo usual es notificarle por escrito al solicitante sobre la disponibilidad del documento, sin embargo, el señor Oliver Canabal alegó que nunca se le notificó sobre la disponibilidad de sus documentos. Al presentar su intención ante el Partido Popular Democrático, el alcalde incluyó un estado financiero jurado que contenía la misma información que se sometió ante la OEG. Esto demuestra interés de cumplir con lo que la Ley Electoral persigue al solicitar dichos documentos; divulgación del estado financiero del aspirante.

La presentación de ese documento, unida a la presunción del cumplimiento de la ley, evidentemente movieron al Secretario General del Partido Popular Democrático a certificar que el aspirante cumplió con todos los requisitos legales. Eso ocurrió el 31 de julio de 2003 por lo que no se trata, evidentemente, de una falta de diligencia. El actual Alcalde, señor Oliver Canabal, solicitó la copia de su informe a la OEG oportunamente, sometió ante la Oficina de Radicaciones del Partido Popular Democrático otros documentos con la misma información que se encontraba en los de la OEG

81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. 4101.

y descansó en la apreciación autorizada del Secretario General del Partido Popular Democrático de que cumplía con todo lo que la Ley Electoral requiere. Ante indicaciones posteriores de que era necesario cumplir con la formalidad, así lo hizo en un plazo minúsculo. En efecto, la breve dilación no afectó a nadie porque no hubo primarias, ni provocó que se introdujera material inexistente antes del 1ro de agosto. Tampoco puede asociarse a algún interés de no divulgar, pues como mencionáramos, ya el señor Oliver Canabal había sometido unos documentos juramentados con toda la información que de éste se requería. De un análisis sobre el contenido del informe que el señor Oliver Canabal presentó originalmente, y el que presentó el 8 de agosto (la copia del de la OEG) se puede colegir fácilmente que ambos recogen, en menor o mayor detalle, el marco completo de la situación económica del señor Oliver Canabal.[2]

Podemos pues concluir, que el objetivo de la divulgación -que estimamos es lo único que razonablemente puede adelantar el Art. 4.001 de la Ley Electoral, *supra*,- se cumplió cabalmente al someterse el Estado Financiero jurado que acompañó la petición de candidatura del señor Oliver Canabal. Someter un Estado Financiero juramentado que contiene sustancialmente la misma información que el Informe Financiero de la OEG fue suficiente, en el caso particular de autos, para dar por satisfecho el requisito de divulgación de

---

[2] Ello también se acredita de un estudio comparativo que efectuó el CPA Pedro A. Galarza y la declaración jurada que éste suscribió el 4 de noviembre de 2003. En síntesis, el señor Galarza, CPA, afirmó que el estado de situación firmado y el

información financiera y el cumplimiento sustancial de los requisitos exigidos por el Art. 4.001 de la Ley Electoral, *supra*.

La realidad es que no se trata de un término fatal o jurisdiccional, por lo que resulta sumamente sorprendente--tomando en consideración que con respecto a las planillas de contribución sobre ingresos y el CRIM se concedieron prórrogas--que con respecto al estado financiero, el cual estimamos tiene un valor informativo menor, la visión administrativa se torne tan inexplicablemente rígida.

Nos sorprende además la decisión de la Comisión Estatal de Elecciones en el caso de epígrafe ya que en 1999, en un caso similar al de marras, dicho organismo aplicó flexiblemente las normas que hoy nos ocupan y aceptó tres (3) candidaturas que en ese momento se cuestionaban. Véase CEE-RS-99-007. En particular, nos atañe la situación de una de las peticionarias, la señora Diana M. Hernández Ferrer. Su pertinencia el caso de autos es tan contundente que transcribiremos textualmente lo que se señaló en dicha resolución.

> La tramitación del caso de la aspirante Diana M. Hernández Ferrer es igualmente censurable. La aspirante también pospuso para el último momento la radicación de su candidatura. El día 2 de agosto el PPD certificó a la CEE que ésta había cumplido con todos los requisitos incluyendo la documentación requerida para ser candidata. Sin embargo, una vez la Secretaría de la CEE examinó dicho expediente constató que en lugar de un informe financiero revisado, tal como exige la ley, la aspirante lo que radicó fue un informe compilado. Confrontada con esta situación **la aspirante radicó un informe**

Informe Financiero de la OEG contienen la misma información financiera pero expuesta de forma diferente.

**revisado el 5 de agosto; tres (3) días después de vencido el término para la radicación de candidaturas.** (Énfasis nuestro).

A pesar de la evidente diferencia entre el estado financiero sometido por la señora Hernández Ferrer y el requerido por la ley, la Comisión Estatal de Elecciones aceptó su candidatura. Entre los fundamentos para dicha determinación, la Comisión Estatal de Elecciones destacó que "las disposiciones de la Ley Electoral que afectan los candidatos tienen un efecto correlativo sobre los electores. Particularmente en lo tocante al derecho del elector a emitir su voto en forma significativa y a tener la opción de seleccionar candidatos que representen las distintas visiones y programas". Posteriormente, la resolución señala que "[D]adas las circunstancias que rodean estos tres casos, en dos de los cuales los aspirantes son candidatos <u>únicos</u>, estaríamos restringiendo sumamente el voto si ese voto sólo puede emitirse por una lista parcial de candidatos y no por todas [sic] los que aspiren a figurar en la contienda". (Énfasis nuestro).

El caso del señor Oliver Canabal es aún más contundente que el de la señora Hernández Ferrer, ya que entre el informe que éste presentó junto con su candidatura y el de la OEG no había ninguna diferencia sustancial. No entendemos pues, como la Comisión Estatal de Elecciones y algunos miembros de este Tribunal pueden llegar a una conclusión tan restrictiva y limitada de la Ley Electoral en el caso de marras. Dicha conclusión socava no sólo el propósito que inspiró la creación de dicha ley, sino además el derecho inquebrantable que tiene

todo ciudadano a expresarse democráticamente. Cabe recordar que el señor Oliver Canabal es el <u>único</u> candidato para la Alcaldía de Lares por uno de los principales partidos políticos del País. De haber acogido la tesis de la Comisión Estatal de Elecciones este Tribunal hubiese, en efecto, restringido el derecho de los electores, en la medida en que se limita incuestionablemente las opciones de éstos para ejercer su derecho al voto. No podemos permitir semejante injusticia.

Nuestros dictámenes no deben impedir que un sector de nuestra sociedad se exprese en las urnas por un mero tecnicismo, ni deben ser irrazonables o contrarios a los postulados democráticos que caracterizan a este Pueblo. Nuestra labor como último eslabón en la Rama Judicial es impartir justicia con el más estricto sentido de razonabilidad.

Para resumir, estamos de acuerdo con el sentir del Tribunal por estimar que el señor Oliver Canabal cumplió con los requisitos de la Ley Electoral para los aspirantes a puestos electivos, por lo que confirmamos la determinación del Tribunal de Primera Instancia. Por ende, procede que se ordene a la CEE a que certifique la candidatura del señor Oliver Canabal para el cargo de Alcalde de Lares.

                              Federico Hernández Denton
                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis Oliver Canabal

  Demandante Peticionario

        v.

                                CT-2003-4

Comisión     Estatal     de
Elecciones

    Demandado Recurrido

Opinión Concurrente emitida por el Juez Asociado señor Rivera Pérez, a la que se unen los Jueces Asociados señor Rebollo López y señor Corrada del Río.

En San Juan, Puerto Rico, a  30 de junio de 2004.

¿Es procedente la certificación por la Comisión Estatal de Elecciones de un aspirante a la reelección como alcalde de un municipio cuando éste incumplió con el término y requisito de presentar en la sede de esa dependencia de gobierno a las doce del mediodía del 1 de agosto de 2003 su estado de situación financiera revisado al 31 de diciembre de 2002, o en la alternativa copia de su Informe Financiero de 2002 presentado ante la Oficina de Ética Gubernamental (en adelante  OEG)?  ¿Es  tal término y requisito uno

esencial? ¿Está obligada la Comisión Estatal de Elecciones a no aceptar ni radicar la nominación si el aspirante incumpliere tal término y requisito? ¿Es tal término y requisito uno de cumplimiento estricto o de naturaleza jurisdiccional? Esas son las interrogantes que tiene esta Curia en el presente caso.

I

El honorable Luis Oliver Canabal, Alcalde del Municipio de Lares (en adelante Alcalde), presentó el 1 de agosto de 2003 ante la Comisión Estatal de Elecciones (en adelante CEE) la candidatura para su re-elección en dicha posición por el Partido Popular Democrático (en adelante P.P.D.). Posteriormente, el 19 de agosto de 2003, el Secretario de la C.E.E., señor Ramón M. Jiménez Fuentes, circuló una comunicación a los miembros de ese cuerpo, junto con copia del Informe Financiero del 2002 del honorable Luis Oliver Canabal presentado como Alcalde del Municipio de Lares ante la OEG y recibida en la Unidad de Radicaciones de CEE el 8 de agosto de 2003. El asunto fue discutido en reunión de la CEE celebrada el 20 de agosto de 2003. Durante dicha reunión el Comisionado Electoral del P.P.D., licenciado Carlos J. López Feliciano solicitó un término para reaccionar. Los Comisionados Electorales del Partido Nuevo Progresista (en adelante P.N.P.), licenciado Thomas Rivera Schatz y el Comisionado Electoral del Partido Independentista Puertorriqueño (en adelante P.I.P.), licenciado Juan Dalmau Ramírez, coincidieron en que la presentación ante la CEE del Informe

Financiero de la OEG había sido tardía. Se le concedió al Comisionado Electoral del P.P.D. hasta el 26 de agosto de 2003 para presentar al Presidente de la CEE su posición por escrito, quien lo hizo dentro del término concedido. El 28 de agosto de 2003 presentó, además, copia del expediente del referido aspirante a re-elección según obra en la Oficina de Radicaciones de Candidaturas del P.P.D., para que se uniera al expediente del asunto pendiente ante la CEE. El Comisionado Electoral del P.N.P. replicó por escrito el 29 de agosto de 2003 la posición del Comisionado Electoral del P.P.D.

La CEE examinó el expediente del referido aspirante a la re-elección, que contiene documentos relacionados con su candidatura y que fueran presentados a la CEE. De dicho expediente la CEE consideró lo siguiente:

1)      El expediente de la candidatura del señor Oliver Canabal se presentó el $1^{ro}$ de agosto de 2003 ante la Unidad de Radicaciones de la Comisión Estatal de Elecciones.

2)      Al someterse dicho expediente no se presentó ningún estado de situación revisado que fuera suscrito por un Contador Público Autorizado. Tampoco se sometió copia del Informe Financiero que fuera sometido ante la Oficina de Ética Gubernamental. **Es decir, cuando se presentó el expediente ante la Unidad de Radicaciones de la CEE, no había ningún documento que informara sobre la situación financiera del señor Oliver Canabal.**

2)      Al momento de la radicación, no surge evidencia alguna del expediente de que una copia del Informe Financiero de la Oficina de Ética Gubernamental hubiera sido debidamente solicitada en dicha Oficina.

3)      **El 8 de agosto de 2003, a las 4:09 PM se radicó en la Unidad de Radicaciones de la CEE copia del Informe Financiero de Funcionarios y Empleados Públicos de la Rama Ejecutiva del Sr. Luis Oliver Canabal, [sic] certificado dicho Informe [sic]    por   la   Oficina   de   Ética Gubernamental.   La certificación hecha por la OEG tiene fecha de 23 de julio de 2003.** (Énfasis Suplido)

El Comisionado Electoral del P.P.D. arguyó ante la CEE que la OEG le proveyó al honorable Luis Oliver Canabal copia certificada de su Informe Financiero de 2002 el 8 de agosto de 2003.  Sostuvo que por ese motivo no lo había presentado ante la CEE hasta el 8 de agosto de 2003. La CEE, con el propósito de evaluar en toda su amplitud la controversia que tenía ante sí, procedió a enviar carta el 9 de septiembre de 2003 a la OEG y solicitarle que certificara de forma oficial el procedimiento utilizado por esa dependencia para la expedición y entrega de copias certificadas de los informes financieros presentados ante esa dependencia de gobierno.  Le solicitó, además, emitiera certificación oficial sobre cuál había sido el trámite seguido ante la solicitud del referido aspirante de copia certificada de su Informe Financiero de 2002, cuándo se certificó la copia de ese documento y la fecha en que se le entregó.  El Director Ejecutivo de la OEG emitió certificación dirigida a la CEE el 18 de septiembre de 2003 estableciendo el procedimiento pautado por esa dependencia para la expedición y entrega de copias certificadas de los informes financieros solicitados por los servidores públicos. Puntualizó en dicho documento lo siguiente:

" [sic] El procedimiento para la expedición y entrega de informes financieros a los servidores públicos o ex servidores públicos que rinden éstos, se describe a continuación:

1) Se recibe la solicitud de copia del informe financiero. La misma debe ser por escrito, dirigida al Director Ejecutivo de la OEG y firmada por el servidor o ex servidor público (peticionario) que rindió el informe financiero. Se puede adelantar la solicitud vía fax. La OEG ha preparado un modelo de solicitud de copia para conveniencia de la parte peticionaria, sin perjuicio de que la persona opte por redactar una comunicación.

2) La solicitud se remite al Área de Auditoria de Informes Financieros para su registro en el sistema de correspondencia. Luego del registro se remite al auditor o especialista que tiene a cargo la agencia ejecutiva donde labora el servidor o ex servidor público. Es entonces que el auditor o especialista prepara la copia simple del informe financiero.

3) Se le prepara una comunicación al peticionario indicándole la disponibilidad de la copia y el trámite para recibirla.

4) Una vez el peticionario se presenta a la OEG y muestra una identificación con foto se procede con la entrega.

5) En caso de que el peticionario envíe a otra persona a recoger la copia del informe financiero, ésta debe traer consigo una carta donde conste la autorización del peticionario y a su vez deberá presentar una identificación con foto" [sic].

Sobre la situación específica de la solicitud, expedición y entrega de copia certificada del Informe Financiero de 2002 del referido aspirante, el Director Ejecutivo de OEG certificó que el 23 de julio de 2003 se recibió una llamada en esa dependencia de gobierno inquiriendo sobre el procedimiento para solicitar copia certificada del Informe Financiero de 2002 presentado ante sí por el aspirante. Expresó que se

orientó a esa persona que tenía que presentar una solicitud por escrito y que el funcionario o persona debidamente autorizada por él debía pasar por la OEG a recoger copia certificada del documento. Certificó que el mismo día 23 de julio de 2003 se expidió copia certificada del Informe Financiero de 2002 del aspirante. El 7 de agosto de 2003 se recibió carta de fecha del 6 de agosto de 2003 del aspirante solicitando la entrega de copia certificada de su Informe Financiero de 2002. Se le entregó al aspirante la copia certificada emitida el 23 de julio de 2003 ese mismo día 7 de agosto de 2003 a las 3:20 de la tarde. Este último presentó la misma en la CEE el 8 de agosto de 2003 a las 4:09 de la tarde.

El honorable Aurelio Gracia Morales, Presidente de la CEE emitió Resolución el 10 de octubre de 2003, notificada a las partes ese mismo día, en vista de que los tres Comisionados Electorales no estaban de acuerdo en forma unánime sobre la forma de resolver la disputa. Determinó que al no cumplir con los requisitos de ley, el honorable Luis Oliver Canabal no podía ser certificado como candidato al cargo de Alcalde por el Municipio de Lares y que el P.P.D. podía someter un candidato sustituto para dicho cargo. Aclaró que ese nuevo candidato no podría ser el propio señor Oliver Canabal. Concluyó que éste estaba descalificado para ser candidato. Sostuvo que el proceso de radicación de candidaturas electivas conlleva el cumplimiento estricto con los términos y documentos exigidos por estatuto. Concluyó que al no cumplir el señor Oliver Canabal con dichos requisitos y no demostrar justa causa para

ello le impidieron certificarlo como candidato a ese puesto electivo.

El 14 de octubre de 2003 el honorable Luis Oliver Canabal y el P.P.D. presentaron ante la CEE moción de reconsideración a la Resolución emitida descalificando al primero como candidato a Alcalde por el Municipio de Lares por el P.P.D. la cual fue declarada no ha lugar el 20 de octubre de 2003, notificada a las partes con copia de la mismo ese mismo día.

El 20 de octubre de 2003 fue presentado por el honorable Luis Oliver Canabal ante el Tribunal de Primera Instancia, Sala Superior de San Juan, recurso para la revisión de la Resolución emitida por el Presidente de la CEE.  El P.P.D. hizo lo propio ese mismo día.  Con fecha del 27 de octubre de 2003 la CEE presentó escrito de oposición al mismo.  El Comisionado Electoral del P.N.P. presentó su escrito de oposición el 31 de octubre de 2003.  La honorable Olivette Sagebién Raffo, Juez Superior emitió Sentencia el 20 de noviembre de 2003, archivando en autos copia de su notificación a las partes ese mismo día, revocando la Resolución recurrida emitida por el Presidente de la  CEE.  Resolvió que era procedente la certificación del honorable Luis Oliver Canabal como aspirante al cargo de Alcalde del Municipio de Lares por el P.P.D. Entendió que el aspirante había sometido a la Oficina de Radicaciones de Candidaturas del P.P.D. un estado financiero bajo juramento que contiene sustancial y esencialmente la misma información que surge del Informe Financiero de 2002 presentado por el aspirante ante la OEG. Concluyó, además, que no sólo fue solicitada dicha copia certificada a la OEG por

el aspirante, previo al vencimiento del término fijado por ley para presentar dicho documento a la CEE, sino que información equivalente fue presentada prontamente ante la Oficina de Radicaciones de Candidaturas del P.P.D. por lo que entendió que el aspirante había cumplido con el término dispuesto por ley. Puntualizó que el hecho de excluir del proceso electoral un aspirante a candidato por no acreditar una gestión o no presentar ante la CEE en determinado momento un informe financiero cuya información ya obra en el expediente de la Oficina de Radicaciones de Candidaturas del P.P.D. por vía de otro documento no adelanta un interés gubernamental apremiante que amerite su exclusión como candidato a un puesto electivo.[3] Entendió que la omisión de presentar ante la CEE el Informe Financiero de 2002 de OEG el 1 de agosto

de 2003 no constituyó un incumplimiento de tal naturaleza que afecte el curso adecuado del proceso electoral, por lo que la interpretación restrictiva que la CEE le impartió al estatuto no le pareció razonable.

El 26 de noviembre de 2003 recurrió mediante *Certiorari* ante el Tribunal de Apelaciones el Comisionado Electoral del P.N.P. para revisar la Sentencia dictada por el Tribunal de Primera Instancia. Señaló como errores cometidos por el Tribunal de Primera Instancia los siguientes:

> Erró el Tribunal de Primera Instancia al no decretar la inexistencia de justa causa para incumplir con el requisito dispuesto

---

[3] Evaluó la validez constitucional del estatuto en cuestión. Aplicó un escrutinio constitucional estricto al así hacerlo. No obstante, ninguna de las partes cuestionó la constitucionalidad del estatuto.

en el Artículo 4.001 de la Ley Electoral de Puerto Rico [sic]

Erró el Tribunal de Primera Instancia al determinar que las formalidades requeridas en el Artíulo [sic] 4.001 de la Ley Electoral son meramente informativas, por lo que su incumplimiento es subsanable mediante el ofrecimiento de documentos similares pero que no cumplen con todo el rigor exigido en dicho articulado.

Erró el Tribunal de Primera Instancia al adoptar lo resuelto por la CEE en Edgardo Arlequín Vélez, Diana M. Hernández Ferrer y otros v. CEE, CEE-RS-99-007 por ser claramente distinguible a la situación fáctica planteada.

Erró el Tribunal de Primera Instancia al omitir información oficial de la C.E.E. que revela que  ni tan siquiera en la Oficina de Radicaciones del PPD se presentó antes del término requerido, documentos financieros de Oliver que cumplieran con los requisitos de ley.

Una vez evidenciado la improcedencia de certificar a Oliver, erró el Tribunal de Primera Instancia al no resolver que nuestro ordenamiento jurídico electoral no provee la sustitución de una persona que nunca se convirtió en candidato.

El 1 de diciembre de 2003 la CEE recurrió mediante *Certiorari* ante el Tribunal de Apelaciones para revisar la Sentencia dictada por el Tribunal de Primera Instancia. Señaló como errores cometidos por el Tribunal de Primera Instancia los siguientes:

Erró el TPI al ordenar la certificación de Oliver como candidato a la Alcaldía de Lares por el PPD no obstante el injustificado incumplimiento con los requisitos

aplicables a la formalización de la candidatura.

Erró el TPI al determinar que Oliver cumplió con la ley al someter un documento distinto al que requiere la Ley Electoral y el Reglamento de Candidaturas.

Erró el TPI al resolver que las oficinas de radicación de los partidos políticos son lo mismo que la CEE.

Erró el TPI al aplicar escrutinio estricto en este caso.

Pendientes ante el Tribunal de Apelaciones los recursos de *certiorari* antes indicados se presentó ante esta Curia recurso de certificación por las partes recurridas, honorable Luis Oliver Canabal y el P.P.D.  El 20 de febrero de 2004 expedimos el auto de certificación solicitado y le concedimos término simultáneo a las partes para presentar sus alegatos.

El 9 de marzo de 2004 el Comisionado Electoral del P.N.P. presentó su alegato.  Destacó como imperativo que las consecuencias jurídicas, de sostenerse la Sentencia del Tribunal de Primera Instancia, constituiría el menoscabo de la certeza de los trabajos de la CEE. Cuestiona la determinación judicial del Tribunal de Primera Instancia, a los efectos que los documentos financieros de aspirantes a candidaturas son puramente informativos.  Alega que el estatuto dispone expresamente que tal requisito es uno esencial.  Sostiene que los hechos de este caso revelan un craso incumplimiento por un incumbente, aspirante a ser re-electo como Alcalde del Municipio de Lares por el P.P.D. que conoce el proceso y no cuenta con razones, o justificación alguna para su incumplimiento al no presentar el 1 de agosto

de 2003 el documento requerido por la Ley Electoral de Puerto Rico. Sostiene que el Comisionado Electoral del P.P.D. no podía acreditar, en la reunión celebrada por la CEE para discutir el asunto, que en la Oficina de Radicaciones de Candidaturas del P.P.D. existía un expediente completo que cumpliera con los requisitos de ley. Puntualiza que la minuta de dicha reunión revela que del expediente oficial de la CEE no surgía la declaración jurada con el estado financiero aludido. Transcribió en su escrito la página número siete (7) de la referida minuta, que recoge el alegado reconocimiento del Comisionado Electoral del P.P.D. a los efectos que no se cumplieron con los requisitos de ley. El contenido de la minuta, según transcrita, reza de la forma siguiente:

> "El Comisionado Rivera declara que en la página dos (2) párrafo segundo, en lo referente a "Incidentes previo a la radicación" dice que: "Surge del expediente del aspirante Oliver Canabal en la Unidad de Radicaciones de Candidaturas del P.P.D. el 19 de julio que éste radicó su candidatura junto a ciertos documentos requeridos por ley."
>
> El Comisionado Rivera cita que: "entregó un estado de situación financiera preparado por un Contador y juramentado por él ante Notario Público **en lo que gestionaba copia de su último informe financiero en la Oficina de Etica Gubernamental lo que solicitó el 23 de julio de 2003."** <u>**Expresa que del expediente no surge dicho estado de situación financiera.**</u> <u>Indica que no hay documento alguno de esa naturaleza juramenada [sic] ante Notario ni preparado por un Contador.</u>
>
> <u>**El Comisionado López afirma que eso es correcto, pues [sic] eso se retuvo en la Oficina de Radicaciones del PPD porque no cumplía con los requisitos de ley**</u>. .   .  ." [Enfasis suplido]

Hizo alusión al Artículo 162 del Reglamento del P.P.D. que dispone lo siguiente:

> Todo aspirante a puestos electivos internos o en primarias o elecciones electorales generales deberá presentar **ante la Secretaría General los siguientes documentos:**
> **1. Toda la documentación exigida por ley en caso de puestos electivos al amparo de las leyes electorales.** [Énfasis suplido]

Sostiene que los requisitos de ley a que hace alusión el Reglamento del P.P.D. incluye el estado de situación revisado o en su defecto el Informe Financiero de la OEG. Distingue el presente caso de precedentes, producto de casos anteriores. Arguye que la ausencia de justa causa y el incumplimiento son atribuibles al propio señor Oliver Canabal y no a la Oficina de Radicaciones de Candidaturas de su partido político. Sostiene que el principio de la igualdad electoral no se extiende a obviar el incumplimiento a la ley, sino en imponer reglas iguales a todos los partidos políticos.

La parte aquí peticionaria presentó su alegato ante nos el 11 de marzo de 2004. Arguye en su alegato que el honorable Luis Oliver Canabal presentó una declaración jurada sobre su estado financiero ante la Oficina de Radicaciones de Candidaturas del P.P.D. el 19 de julio de 2003. El Secretario General de ese partido político, licenciado Fernando Torres Ramírez certificó el 31 de julio de 2003 su candidatura y concluyó que había cumplido con todos los requisitos de ley y de los reglamentos aplicables. Sostiene que el Presidente de la CEE erró al concluir que la Oficina de Radicaciones de Candidaturas del P.P.D. no era parte de la CEE y al impartirle una interpretación rigurosa a un requisito de forma. Sostiene, además, como correcto lo resuelto por el Tribunal de Primera Instancia a los efectos que la Oficina de

Radicaciones de Candidaturas del P.P.D. sí es parte de la CEE. Arguye que al haberse presentado en esa oficina del P.P.D. desde el 19 de julio de 2003 una declaración jurada incluyendo un estado financiero que fue suplementado el 8 de agosto de 2003 ante la CEE con copia del Informe Financiero de 2002 de la OEG se cumplió con los requisitos de la Ley Electoral de Puerto Rico, por cumplirse cabalmente con la sustancia de los mismos. Describe el requisito de ley en cuestión como uno informativo y no de naturaleza constitutiva o calificativa.

El 15 de marzo de 2004 la CEE presentó su alegato ante nos. Arguye que el término y el requisito de formalización de candidatura con los que incumplió el señor Oliver Canabal es de fácil cumplimiento. Sostiene que responde a intereses legítimos, es razonable y como tal debió acatarse y cumplirse en este caso, así como cumplieron otros muchos aspirantes a candidaturas electivas. Puntualiza sobre las consecuencias de abrir las puertas para que, sin razón y causa justificada, los aspirantes a candidaturas electivas cumplan o sometan a su arbitrio, cuando les parezca, ante la CEE los requisitos y documentos que exige la ley para formalizar una candidatura a la que aspiran. Considera como error fundamental del Tribunal de Primera Instancia no evaluar este asunto sobre la base de la clara disposición estatutaria aplicable. Arguye que no teniendo el señor Oliver Canabal razón alguna para justificar su demora en cumplir al 1 de agosto de 2003 con el referido requisito estatutario cambió el enfoque de su caso y optó por alegar que sometió información financiera a la Oficina de Radicaciones de Candidaturas del P.P.D. equivalente

a la requerida por ley para ser presentada ante la CEE antes del 1 de agosto de 2003, y que esa oficina del P.P.D. es una extensión de la CEE, a los efectos del propósito del estatuto. Sostiene que a base de esos argumentos el aspirante evadió tener que justificar su incumplimiento. Expresa que el efecto neto de lo resuelto por el Tribunal de Primera Instancia es que una declaración jurada que contenga información financiera es igual a un estado financiero revisado por un contador público autorizado o a un Informe Financiero presentado ante la OEG, y que la Oficina de Radicaciones de Candidaturas de un partido político es igual, equivalente o lo mismo a la Unidad de Radicaciones de Candidaturas de la CEE. Sostiene vehementemente que ambas premisas son equivocadas y no deben sostenerse como cuestión de derecho. Expresa que de mantenerse lo resuelto por el Tribunal de Primera Instancia las consecuencias sobre el proceso electoral serían funestas ya que la CEE perdería el poder de supervisión del proceso, pasando el mismo a manos de los partidos políticos. Afirma que colocaría el proceso de radicación de candidaturas bajo el poder absoluto de los partidos políticos, convirtiendo a la CEE en un mero recibidor de documentos, sin facultad para examinar y aceptar o rechazar los mismos. Sostiene que la Sentencia del Tribunal de Primera Instancia contraviene la visión expuesta por la Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico de 1982, cuyas recomendaciones se incorporaron en la reforma electoral de 1983, y para la cual la CEE como organismo rector del proceso electoral debe de funcionar libre de ataduras partidistas, con

autonomía en sus funciones y con eficiencia y balance en su administración.

II

La Ley Electoral de Puerto Rico dispone sobre los mecanismos a seguir en procesos eleccionarios. Provee para el proceso de candidaturas. Define los principios esenciales de las mismas y prescribe los pasos a seguir para figurar como candidato en un evento electoral.

El Artículo 4.001 de la ley Electoral de Puerto Rico[4] dispone lo siguiente:

> Las disposiciones a continuación constituirán los principios esenciales de toda candidatura.
>
> (a) Todo aspirante a una candidatura **deberá radicar en la Comisión su estado de situación revisado al 31 de diciembre anterior al de la fecha de radicación y bajo juramento, junto con el juramento de aceptación de la nominación para figurar en una elección. Aquellos aspirantes que hallan tenido la obligación de rendir un informe financiero arte [sic] la Oficina de Ética Gubernamental, podrán radicar copia del mismo en sustitución del estado de situación revisado. La Comisión no aceptará ni radio [sic] la nominación si el aspirante incumpliere esta disposición.** El estado de situación o informe de ética gubernamental deben ir acompañado de una copia certificada de las planillas de contribución sobre ingresos rendidas en los últimos cinco (5) años, así como de una certificación del Secretario de Hacienda en que haga constar el cumplimiento por parte del candidato de la obligación de rendir su planilla de contribución sobre

---

[4] 16 L.P.R.A. sec. 3151.

ingresos en los últimos diez (10) años y las deudas existentes, si alguna, por dicho concepto, y de tener una deuda, que se ha acogido a un plan de pago y está cumpliendo con el mismo. El Secretario del Departamento de Hacienda expedirá tales copias y certificaciones libre de cargos. Además, deberá certificar toda deuda contributiva, si alguna, al Estado Libre Asociado de Puerto Rico o sus gobiernos municipales por concepto de contribuciones sobre la propiedad inmueble sobre caudales relictos. De no ser recibidas tales certificaciones al momento de la radicación, podrán sustituirse con evidencia de que tales certificaciones han sido debidamente solicitadas. **La Comisión no aceptará ni radicará la nominación si el aspirante incumpliere esta disposición. La Comisión establecerá mediante reglamento el contenido mínimo de los estados de situación y dispondrá lo relativo a la información relacionada con el cumplimiento de la responsabilidad contributiva. En todos los casos el estado de situación revisado deben ser al 31 de diciembre del año anterior al año en que se celebren las primarias.**

**Todo candidato que resultare electo en la elección general deben radicar en la Comisión un informe auditado previo a su certificación como candidato electo. La Comisión no certificará a ningún candidato que no cumpla con la radicación del informe auditado.** (Énfasis suplido)

El Artículo 4.008-A de la Ley Electoral de Puerto Rico[5] dispone lo siguiente:

**Fecha para abrir candidaturas y fechas límites**

---

[5] 16 L.P.R.A. sec. 3158a (a) y (f).

La Comisión y los partidos abrirán el proceso de radicación de candidaturas **el día primero de junio del año anterior al de elecciones generales. Las fechas limites que aplicarán a los varios procesos y actividades relacionadas con dichas candidaturas y primarias serán como sigue:**

**(a)   Se podrán radicar candidaturas para todos los puestos públicos sujetos a elección general hasta el día primero de agosto del año que antecede a las elecciones generales. En caso de radicar un número de candidatos exacto o menor a los puestos objetos de nominación por este partido, luego de cumplir con los otros requisitos de este título, los mismos quedarán certificados automáticamente como los candidatos oficiales de dicho partido y no tendrán que radicar peticiones de primarias.**
                      ...
**(f)   La hora límite aplicable a todos los casos será las 12:00 del mediodía; Disponiéndose, que cuando alguna de dichas fechas cayere en día no laborable, la misma se correrá al siguiente día laborable.**

Los **candidatos y aspirantes a candidaturas** deberán radicar informe de ingresos y gastos en la Comisión en las fechas que se disponen en la sec. 3117 de este título, **y los estados de situación requeridos se regirán por los dispuesto en la sec. 3151 de este título.** (Énfasis suplido)

La Sección 3.5 del Reglamento para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos[6] dispone lo siguiente:

**Radicación de Candidaturas**

---

[6] Sec. 3.5 del Reglamento para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos de 29 de mayo de 2003, Comisión Estatal de Elecciones, págs. 16-17.

Se abrirán las candidaturas para todos los puestos públicos sujetos a elección general no más tarde del 1ro de junio del año anterior  al que hayan de celebrarse las elecciones generales. **Los aspirantes deberán radicar en la Comisión y en las oficinas de los partidos políticos a los cuales pertenecen, los documentos necesarios para la radicación de las candidaturas no más tarde del mediodía (12:00 m) del 1ro de agosto del año anterior  al que hayan de celebrarse las elecciones generales.** En caso de radicar un número de aspirantes a candidatos  exacto o menor a los puestos objeto de nominación por ese partido político, luego de cumplir con los otros requisitos de la "Ley Electoral de Puerto Rico" y sus reglamentos, los mismos quedarán certificados automáticamente como los candidatos oficiales de dicho partido político y no tendrán que radicar peticiones de primarias. De igual forma, si luego de iniciado el proceso de radicación de peticiones de endoso en una candidatura por razón de retiro, renuncia, descalificación o muerte de los otros aspirantes, quedare un solo aspirante, éste no tendrá que completar la radicación de peticiones de primarias. (Énfasis suplido).

La Sección 3.14 del Reglamento para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos[7] dispone lo siguiente:

**Requisitos de los Aspirantes en Primarias**

Podrán participar como aspirantes en una primaria  de un partido político los que cumplan con los siguientes requisitos:

...

4. **Cumplir con los requisitos exigidos por el partido político en sus reglamentos, siempre y cuando los mismos no estén en**

---

[7] Sec. 3.14 del Reglamento para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos de 29 de mayo de 2003, Comisión Estatal de Elecciones, págs. 26-28.

**conflicto con la "Ley Electoral de Puerto Rico" o este Reglamento.**
...

6. Cumplir con todos los requisitos establecidos en el Art. 4.001 de la Ley Electoral vigente, según enmendada.

a. Radicar conjuntamente con la intención de candidatura: **Un estado de situación revisado por un Contador Público Autorizado (C.P.A.), refle-jando la situación financiera al 31 de diciembre anterior al de la fecha de radicación y juramento por el aspirante, haciendo constar que la información contenida en el mismo es correcta. El Estado de Situación, deberá contener la estampilla o sello original del Colegio de Contadores Públicos Auto-rizados, la firma en original del Contador Público, número de licencia y fecha de expiración de la misma. Aquellos aspirantes que hayan tenido la obligación de rendir un informe financiero ante la Oficina de Ética Gubernamental, podrán radicar copia del mismo en sustitución del estado de situación revisado. La Comisión no aceptará ni radicará la nominación si el aspirante incumpliere esta disposición.**

b. Copias de Planillas de Contribución sobre Ingresos de los últimos cinco (5) años certificadas por el Departamento de Hacienda.

c. Certificación del Departamento de Hacienda de que ha rendido planillas de contribución sobre ingresos en los últimos diez (10) años y las deudas existentes si alguna por dicho concepto; y de tener deuda que se ha

acogido a un plan de pagos y está cumpliendo con el mismo. Si no ha rendido planillas de contribución sobre ingresos en algún año, deberá incluir una Declaración Jurada explicando la razón. Esta certificación será libre de costo si el aspirante somete con su solicitud copia de la Notificación de Intención de Candidatura juramentada.

d.   Certificación de Hacienda de deuda por concepto de caudales relictos (herencia y donaciones).

e.   Certificación de deudas de contribuciones sobre la propiedad inmueble y mueble, cuando sea procedente, del CRIM.

De no tener a mano las certificaciones "c", "d" y "e" al momento de la radicación original, podrán sustituirse éstos con evidencia de que tales certificaciones han sido debidamente solicitadas. (Énfasis suplido).

La CEE mediante Resolución de su Presidente concluyó que no existe duda alguna que el Informe Financiero de 2002 rendido por el aspirante a la OEG fue presentado ante la CEE fuera del término dispuesto por ley para así hacerlo. El aspirante tenía hasta las doce del mediodía de 1 de agosto de 2003 para hacerlo. El mismo fue presentado ante la CEE el 8 de agosto de 2003 a las 4:09 de la tarde. El Presidente de la CEE determinó que el aspirante no había presentado justificación alguna o excusa razonable para la demora en la presentación de copia de su

Informe Financiero de 2002.  Concluyó que con un mínimo de diligencia el documento pudo haber sido recogido en la OEG y presentado en la CEE con suficiente anticipación a la fecha y hora límite que establece la Ley Electoral de Puerto Rico. Concluyó, además, que tal incumplimiento conllevaba que la CEE, por mandato de ley, no pudiera aceptar la candidatura del aspirante y por ende, no pudiera ser certificado como tal.  El Presidente de la CEE aclaró que ese mismo curso de acción se había tomado en casos de otros aspirantes, en circunstancias similares.  Por una situación idéntica, someter copia de un estado financiero el 12 de agosto de 2003, se procedió a rechazar la aspiración de la señora María Escalera Casanova como candidata a Alcalde del Municipio de Loíza por el P.P.D. Sostuvo ambas decisiones en lo resuelto y pautado por este Tribunal en **Escalona Vicenty v. CEE**[8] **y en P.R.P. v. E.L.A.**[9], **entre otros.**

En Escalona Vicenty v. CEE[10] expresamos lo siguiente:

> Su petición se basa en un análisis
> dual originado en el texto del Art. 4.013
> de la Ley.[11]  Esta disposición, en lo

---

[8] 115 D.P.R. 529 (1984).

[9] 115 D.P.R. 631 (1984).

[10] Supra, Id. Págs. 532-532.

[11] Dispone:
"[sic] El Presidente en unión al  Comisionado Electoral del partido concernido, pasará juicio sobre la validez  de las Peticiones de Primarias presentadas.  Tendrán hasta las doce (12) del mediodía del décimo día natural siguiente a la radicación de una petición para evaluar y rechazar la misma mediante devolución al aspirante.  Toda petición no rechazada dentro de dicho término se tendrá por aceptada y tendrá que acreditársele al aspirante que  la radicó.
"Durante los últimos quince (15) días del período de radicación, si la devolución de peticiones afectara la certificación del aspirante, éste tendrá un período de diez

pertinente, concede a la Comisión diez (10) días para evaluar, rechazar y devolver a cualquier aspirante toda papeleta, bajo apercibimiento de estimarse aceptada. Primeramente alega que las 196 peticiones devueltas por la Comisión quedaron validadas automáticamente al no habérselas remitido dentro de 10 días de ser presentadas. En segundo término, argumenta, que por igual razón, las restantes papeletas, inclusive las 2,219 presentadas *tardíamente*, también quedaron aceptadas al no ser objetadas. Finaliza su ruego exponiendo que al quedar validadas todas esas peticiones procedía que la Comisión lo certificara.

**No tiene razón. La tesis del peticionario Escalona Vicenty de que existe un deber ministerial de la Comisión en certificarle como aspirante, debido al automatismo adjudicativo prescrito en el Art. 4.013, no es correcta.**

Ciertamente la ley declara ipso jure válida toda petición que la Comisión no devuelva dentro del término de 10 días. Sin embargo, la aplicación de ese precepto inexorablemente tiene que descansar sobre la premisa de que tales peticiones han sido radicadas en la Comisión a tiempo, en este caso, en o antes del mediodía del 17 de abril de 1984. No podemos sostener una convalidación jurídica innecesaria de papeletas que ab initio no cumplan con la ley. **Resolvemos que para que opere el automatismo del Art. 4.013 es *condictio***

_____

(10) días desde la devolución para sustituir las peticiones devueltas.

"Las razones para rechazar una petición serán las siguientes:

"(a) Que el peticionario no es un elector afiliado al partido del candidato, o no es elector de ese precinto; o

"(b) Que la petición está incompleta; o

"(c) Que el peticionario ya ejercitó su derecho de petición con otro aspirante al mismo cargo; o

"(d) Que el peticionario agotó su derecho de petición para todos los candidatos a que tiene derecho en su precinto. El Presidente expedirá una certificación de los aspirantes, que habiendo completado los requisitos necesarios figurarán en la papeleta correspondiente." [sic](Énfasis suplido.)

> *juris* la radicación a tiempo de las papeletas.
>
> El peticionario Escalona Vicenty no cumplió con lo dispuesto en el Art. 4.009(a). **Sólo presentó algunas peticiones de primarias a tiempo. Las otras 2,219 las llevó por la tarde, ya vencido el término.** Sobre estas últimas no opera el precepto de ley. La Comisión no venía obligada a observar el término de 10 días del Art. 4.013 para rechazarlas. (Énfasis suplido)

En P.R.P. v. E.L.A.[12] expresamos lo siguiente:

> A poco profundicemos, hemos de percibir que en su dinámica operacional, parte sustancial de toda la Ley Electoral –por la naturaleza inherente del proceso reglado– corresponde a un mandato legislativo plasmado estatutariamente mediante una exposición detallada de trámites y eventos de carácter mecánico. **Esa minuciosidad de pasos a observarse, procesos a seguirse, términos a cumplirse, documentos y demás requisitos, son típicos de toda reglamentación legal en materia electoral. Por ello no puede minimizarse su importancia y evaluación jurídica.** (Énfasis suplido)

III

**Nuestro deber, dentro de la forma republicana del gobierno, se circunscribe a interpretar la ley y despejar las lagunas que existan en la misma, utilizando como guía la intención del legislador.** En Alejandro Rivera v. E.L.A.,[13] nos expresamos al respecto de la manera siguiente:

> Además, nos señala R. E. Bernier y J.A. Cuevas Segarra, en su obra *Aprobación e interpretación de las leyes de Puerto Rico*, 2da. Ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 299, que "[b]ajo un sistema de separación de

---

[12] Supra, Id. pág. 636.

[13] 140 D.P.R. 538, 545 (1996).

poderes como el que funciona en Puerto Rico, la Asamblea Legislativa tiene la facultad de aprobar las leyes. El Poder Judicial ejercitado por los tribunales consiste en el ejercicio de las facultades de resolver los litigios a través de la interpretación de la ley. En el desempeño normal de sus funciones, los tribunales están obligados a respetar la voluntad legislativa aunque los magistrados discrepen personalmente de la sabiduría de los actos legislativos. Interpretar una ley en forma que sea contraria a la intención del legislador implica la usurpación por la rama judicial de las prerrogativas de la rama legislativa. Por tanto, el intérprete debe abstenerse de sustituir el criterio legislativo por sus propios conceptos de lo justo, razonable y deseable".

Es norma reiterada de hermenéutica que la letra clara de una ley es la mejor expresión del espíritu de la misma.[14] A esos efectos el artículo 14 del Código Civil de Puerto Rico[15] dispone que "[c]uando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Este precepto estatutario reconoce que la ley está sujeta a ser interpretada, pero limita la interpretación a lo que surja del texto claro de la misma.

El artículo 19 de Código Civil de Puerto Rico[16] reconoce que el espíritu de la ley, reflejado en la intención legislativa, es la mejor herramienta para encontrar el verdadero sentido de una ley. Como mencionáramos

---

[14] Santiago v. Supte. Policía de P.R. res. el 23 de junio de 2000, 2000 T.S.P.R. 95, 151 D.P.R.___(2000), 2000 J.T.S. 115; Alejandro Rivera v. E.L.A., supra; Meléndez v. Tribunal Superior, 90 D.P.R. 656 (1964).

[15] 31 L.P.R.A. sec. 14.

anteriormente, el ejercicio de la interpretación estatutaria está limitado  por varias reglas de deferencia y abstención de  parte de la Rama Judicial.  El  tribunal tiene que buscar la voluntad del legislador. [17]   El espíritu de la ley juega un papel fundamental en la interpretación de un estatuto.  **La intención del legislador al aprobar una ley es tan importante que hemos establecido, que si la letra clara de una ley está en contraposición  son su espíritu, claramente establecida en el historial legislativo, prevalecerá este último.**[18]  Por otro lado, hemos resuelto que la función de los tribunales es la de interpretar la ley y no juzgar la sabiduría del legislador al aprobarla.[19]

En el caso  de <u>Clínica Juliá v. Sec. de Hacienda,</u>[20] expresamos lo siguiente:

> El juez es un intérprete, y no un creador. **Su facultad de interpretación adquiere relevancia cuando del estatuto surgen varios significados probables que suministren un margen adecuado para selección judicial, pero si el lenguaje es tan inequívoco que postula un solo significado, un sentido cabal de humildad  y autodisciplina judicial requiere la  aplicación de la voluntad  legislativa.** (Énfasis suplido).

---

[16] Íd., sec. 19.

[17] <u>Alejandro Rivera v. E.L.A.</u>, supra.

[18] <u>Sucn. Alvarez v. Srio de Justicia</u>, res. el 11 de febrero de 2000, 2000 T.S.P.R. 21, 150 D.P.R.____ (2000), 2000 J.T.S. 40; <u>Pueblo v. Zayas Rodríguez</u>, 147 D.P.R. 530 (1999); <u>Figueroa v. Díaz</u>, 75 D.P.R. 163 (1953).

[19] <u>Alonso García v. S.L.G.</u>, res. el 6 de septiembre de 2001, 2001 T.S.P.R. 126, 155 D.P.R.____ (2001) 2001 J.T.S. 129, <u>Famanina v. Corp. Azucarera de P.R.</u>, 113 D.P.R. 654 (1982).

[20] 76 D.P.R. 509, 521 (1954). Véase, además: <u>Srio. del Trabajo v. G.P. Inds., Inc.</u>, res. el 17 de enero de 2001, 2001 T.S.P.R. 4, 153 D.P.R. ___ (2001), 2001 J.T.S. 7.

Siguiendo esta misma línea, nos expresamos en el caso de Meléndez v. Tribunal Superior [21] de la manera siguiente:

> En *Parrilla v. Loíza Sugar Company*, 49 D.P.R. 597, 600 (1936), expusimos que "La regla de estricta hermenéutica no exige ni puede justificar que se elimine mediante legislación judicial cualquier parte de una ley, no importa cuál pueda ser la opinión del tribunal respecto a la conveniencia de la misma". Creemos justificado añadir que cuando los términos de un estatuto son claros y susceptibles de una interpretación inequívoca según el significado común y corriente de sus palabras y su construcción gramatical, bajo la misma regla tampoco debemos intercalar palabras ni suplir omisiones al interpretario [sic].

El principio de deferencia a la voluntad legislativa es tal que se ha resuelto que una omisión por inadvertencia del legislador no puede ser curada mediante fiat judicial. La doctrina del casus omissus, adoptada por esta Curia en el caso de Andrades v. Pizza Hut Mgt. Corp.,[22] nos lo impide. En ese caso[23] nos expresamos de la manera siguiente, citando a Bernier y Cuevas Segarra[24]:

> **Es una regla de hermenéutica legal que las omisiones del legislador no pueden ser curadas por los tribunales. Esa es la regla general tal como es expuesta corrientemente por los tribunales y se refiere a los casos en que el lenguaje del estatuto ha omitido algo que tampoco está dentro del propósito del mismo, pero que es claro de su lectura integral que fue omitido por inadvertencia. La razón de la regla es que el tribunal sólo interpreta y no legisla.**

---

[21] 90 D.P.R. 656, 661-662 (1964); Véase, además: Martínez v. Rodríguez res. el 13 de agosto de 2003, 2003 T.S.P.R. 134, 160 D.P.R. _____ (2003), 2003 J.T.S. 134.

[22] 140 D.P.R. 959 (1996).

[23] Íd., pág. 957.

[24] R.E. Bernier y J. A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da. ed., San Juan, Pubs. J.T.S., 1987, Vol. I, Cap. 47, pág. 311.

La regla se ha expresado en la siguiente forma: Al interpretar un estatuto, la intención legislativa debe ser buscada en el lenguaje usado en él con la ayuda que permiten las reglas de hermenéutica legal. **Pero un lenguaje nuevo o una disposición enteramente nueva no se puede leer en el estatuto para darle un significado que no está incluido en él. Aunque el tribunal puede interpretar frases oscuras y dudosas para darle efecto a la presunta intención del legislador y llevar a cabo los propósitos de la ley; no se puede por interpretación curar un casus omissus, no importa lo justo y deseable que pueda parecer.** *Meléndez v. Tribunal Superior*, 90 D.P.R. 656, 662 (1964) (Ramírez). (Énfasis nuestro).

Utilizando las reglas de hermenéutica antes esbozadas, pasemos a interpretar las disposiciones estatutarias y reglamentarias en cuestión.

Ninguna de las partes cuestionaron ante el Tribunal de Primera Instancia, el Tribunal de Apelaciones y ante esta Curia la validez constitucional del Artículo 4.001, *supra* y del Artículo 4.008 A, incisos (a) y (f), *supra*. No obstante, el Presidente de la CEE despejó cualquier tensión que pudiera existir entre la letra del estatuto y el interés público inmanente del esquema democrático de la Constitución de Puerto Rico. El ***mens legis*** que produjo la formulación de política pública pautada así se lo permitía. No le adscribió al incumplimiento del término y del requisito estatutario de presentar en la Unidad de Radicaciones de Candidaturas de la CEE a las doce del mediodía del 1 de agosto de 2003 el estado de situación revisado al 31 de diciembre de 2002 o en su sustitución copia del Informe Financiero de 2000 de la O.E.G. el carácter de fatal o de naturaleza jurisdiccional. Consideró que la falta de cumplimiento de tal requisito por un aspirante

a candidato a una posición electiva tenía que evaluarse a base de la presencia o no de una excusa o justificación razonable para así no hacerlo, o sea le impartió a tal requisito el carácter de cumplimiento estricto.

La letra del estatuto claramente dispone que todo aspirante a una candidatura electiva **deberá** radicar en la CEE su estado de situación revisado al 31 de diciembre del año anterior al de la fecha de radicación y bajo juramento, o en su sustitución el Informe Financiero presentado ante la OEG correspondiente al año anterior. Le adscribe a tal requisito el carácter de **principio esencial de toda candidatura**. Le concede para así hacerlo hasta el primero de agosto del año que antecede a las elecciones generales a las doce del mediodía. Dispone en forma específica y clara que si el aspirante incumple con tal requisito o condición la CEE no **"aceptará ni radicará"** la nominación. La expresión clara de la letra del estatuto en cuestión es la mejor expresión del espíritu que animó su aprobación. Su letra no debe ser menospreciada bajo el pretexto de cumplir un espíritu distinto o contrario que no emana del *mens legis*. Tampoco puede utilizarse el pretexto de estar en un ejercicio de búsqueda de la armonía del estatuto en cuestión con el esquema democrático de la Constitución de Puerto Rico cuando en el caso de autos no podemos apreciar la presencia de tensión alguna entre el referido estatuto y el interés público inmanente del mismo.

¿Es la Oficina de Radicaciones de Candidaturas de los partidos políticos un apéndice o una extensión de la Unidad

de Radicaciones de Candidaturas de la CEE a los fines del cumplimiento por los aspirantes a candidaturas electivas de los requisitos dispuesto por el Artículo 4.001, *supra* y el Artículo 4.008A (a) y (f), *supra*? La contestación es en la negativa.  Veamos.

Al descargar nuestra función de interpretar una disposición particular de un estatuto los tribunales debemos siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarlo, de manera que nuestra interpretación asegure la efectividad de la intención que lo anima.[25]  Todo acto legislativo persigue un propósito, trata de corregir un mal, alterar una situación existente, complementar una reglamentación vigente, fomentar algún bien específico o bienestar en general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno, entre otros.  En el proceso de encontrar el significado de una ley que logre los propósitos del legislador la interpretación debe hacerse con fines socialmente útiles.[26]

La Ley Electoral de Puerto Rico persigue un propósito específico, fomenta un bien general y a la misma vez protege derechos individuales. Persigue el propósito específico de que los procesos electorales están revestidos de certeza, objetividad, justicia y trato igual, entre otros.  Permite, además, a la CEE aprobar la reglamentación y realizar la

---

[25] <u>Irizarry v. J&J Cons. Prods., Co., Inc.</u>, res. el 27 de enero de 2000, 2000 T.S.P.R. 15, 150 D.P.R._____ (2000), 2000 J.T.S. 27; <u>Dorante v. Wrangler of P.R.</u>, 145 D.P.R. 408 (1998); <u>Vázquez v. A.R.P.E.</u>, 128 D.P.R. 513 (1991).

[26] <u>Pueblo v. Zayas Rodríguez</u>, supra.

supervisión de los procesos electorales para garantizar la pureza de los mismos y que se alcancen los objetivos perseguidos. Fomenta el bienestar general pues persigue el funcionamiento armonioso de la democracia constitucional que vivimos los puertorriqueños. En su función de reglamentación y supervisión de los procesos electorales protege los derechos de los individuos que aspiran a las distintas candidaturas electivas y por ende a aquellos que respaldan tales aspiraciones, en igualdad de términos, condiciones y requisitos.

En el proceso de encontrar el significado del estatuto en cuestión y que nuestra interpretación logre los propósitos del legislador tenemos que descargar nuestra función normativa buscando siempre un fin socialmente útil. La CEE ha determinado en casos resueltos ante sí que carece de autoridad funcional para implementar planes, comparar el funcionamiento de los mismos, medir el progreso de las operaciones, la corrección de los trabajos y tomar oportunamente acción correctiva, cuando se requiera, respecto a las Oficinas de Radicaciones de Candidaturas de los partidos políticos. La CEE descarga su función dentro de la realidad de que los partidos políticos mantienen un estricto control y confidencialidad sobre su sistema de radicación y evaluación de aspirantes y candidatos. El Presidente de la CEE no ejerce control alguno directo ni indirecto sobre la Oficina de Radicaciones de Candidaturas de los partidos políticos y sus

procesos de evaluación.[27] La letra clara del estatuto dispone que los documentos requeridos por el Artículo 4.001, *supra* a ser radicados en o antes de la fecha y hora dispuesta por el Artículo 4.008 A (a) y (f), *supra* **deberán** ser presentados ante la CEE. No compartimos la óptica del Tribunal de Primera Instancia de que las Oficinas de Radicación de Candidaturas de los partidos políticos son una extensión de la CEE a los fines del estatuto en cuestión. La interpretación del foro primario no sólo es contraria a la letra de la ley sino que no alcanzó un fin socialmente útil pues los procesos electorales tienen que estar revestidos de certeza, de objetividad e igual trato a los aspirantes a candidatos. No podemos sostener lo actuado por el foro de primera instancia pues de hacerlo la función de reglamentación y supervisión de la CEE de los procesos electorales, a tenor con el mandato legislativo, quedaría conculcada. De sostener lo actuado por el Tribunal de Primera Instancia se neutralizaría la función revisora o de supervisión institucional de la CEE, colocando el proceso de radicación de candidaturas en manos de los partidos políticos, convirtiendo a la CEE en un mero recibidor de documentos sin facultar para examinar, aceptar o rechazar los mismos.

¿Es el término y el requisito estatutario antes indicado de cumplimiento estricto o de naturaleza jurisdiccional? El referido requisito estatutario es de cumplimiento estricto. Es la única interpretación, dentro de

---

[27] Edgardo Arlequín Vélez y otros, CEE-RS-99-007.

la selección judicial que nos permite el **mens legis**, que produce un fin socialmente útil. Veamos.

Al reconocerle al referido requisito estatutario el carácter de cumplimiento estricto permitimos a la CEE descargar su ministerio en forma objetiva, justa y en forma igual para todos los aspirantes. La interpretación que hoy le impartimos al presente estatuto le otorga certeza a los procesos electorales y a las actuaciones de la CEE, en su facultad de reglamentación y supervisión de los mismos. Fomenta, además, el funcionamiento armonioso y pacífico de nuestra democracia constitucional protegiendo el interés público inmanente del magno documento.

Hemos expresado que cuando se trata de un término o requisito de cumplimiento estricto el foro adjudicativo[28] queda liberado del automatismo que conlleva el requisito jurisdiccional y puede "proveer justicia según lo ameriten las circunstancias".[29] Cuando un término o requisito es de cumplimiento estricto su observancia tardía "es permisible de existir y demostrarse a cabalidad una justa causa" para no cumplir rigurosamente con el término o el requisito en cuestión.[30] No se permite desviación alguna del plazo o

---

[28] En este caso la CEE.

[29] Arriaga v. F.S.E., 145 D.P.R. 122 (1998); Loperena Irizarry v. E.L.A., 106 D.P.R. 357 (1977).

[30] Arriaga v. F.S.E., supra; González Santos v. Bourns P.R. Inc., 125 D.P.R. 48 (1989).

requisito a menos que la tardanza ocurrida se justifique detalladamente y a cabalidad.[31]

Cuando en un proceso electoral se encuentra en cuestionamiento precisamente el alcance de un término o requisito de cumplimiento estricto la CEE no goza de discreción para prorrogar el término automáticamente. La CEE tiene discreción para extender un término de tal naturaleza sólo cuando la parte que lo solicita demuestra justa causa para la tardanza. En ausencia de excusa razonable o justa causa la CEE carece de discreción para prorrogar el término y por ende certificar la candidatura del aspirante.[32]

La CEE puede extender a un aspirante un término para cumplir con un requisito de cumplimiento estricto si están presentes dos (2) condiciones: (1) que en efecto exista justa causa para la dilación; (2) que el aspirante demuestre detalladamente a la CEE las bases razonables que tiene para la dilación, es decir que el aspirante acredite de manera adecuada la justa causa aludida.[33]

¿Medió justa causa o excusa razonable de parte del aspirante para el incumplimiento del término y requisito de cumplimiento estricto dispuesto por estatuto? ¿Demostró detalladamente a la CEE las bases razonables que tuvo para su incumplimiento? ¿Acreditó a la CEE de manera adecuada su justa

---

[31] Arriaga v. F.S.E., *supra*; Pueblo v. Fragoso Sierra, 109 D.P.R. 536 (1980).

[32] Arriaga v. F.S.E., *supra*; Bco. Popular de P.R. v. Mun. de Aguadilla, 144 D.P.R. 651 (1997).

[33] Arriaga v. F.S.E., *supra*.

causa?  En el presente caso no están presentes ninguna de las condiciones aludidas.  Veamos.

El aspirante no presentó en la CEE el documento requerido en la fecha que dispone el estatuto.  Presentó en la Oficina de Radicaciones de Candidaturas del P.P.D. antes del 1 de agosto de 2003 un documento que no cumplía con lo requerido por el Artículo 4.001, *supra*.

El 23 de julio de 2003 una persona se comunicó con la OEG inquiriendo sobre el procedimiento para solicitar copia certificada del Informe Financiero de 2002 del aspirante.  La OEG orientó a esa persona sobre la necesidad de una solicitud por escrito para entregar la copia certificada del documento. El aspirante cursó carta a la OEG el 23 de julio de 2003 solicitando copia de su Informe Financiero de 2002.  Ese mismo día la señora Vivian Sanes Ramos, Directora Auxiliar del Área de Auditores de Informes Financieros de la OEG le cursó una carta al  aspirante informándole que las normas aplicables a ese tipo de petición requerían que el solicitante compareciera personalmente a recoger el documento requerido.  Le indicaron que debía traer consigo una identificación adecuada.  La OEG expidió copia certificada del documento ese mismo día.  El 7 de agosto de 2003 la OEG recibió una carta del aspirante solicitando la entrega de una copia certificada de su Informe Financiero de 2002 como Alcalde del Municipio de Lares.  Se le entregó la copia certificada del documento emitido desde el 23 de julio de 2003 ese mismo día, 7 de agosto de 2003 a las 3:20 de la tarde.  El aspirante presentó dicha copia

certificada en la CEE el 8 de agosto de 2003 a la 4:09 de la tarde.

El aspirante presentó ante la CEE una escueta declaración jurada fechada el 3 de noviembre de 2003 en la que expuso que él nunca recibió carta alguna de la señora Vivian Sanes Ramos, Oficial de la OEG que le indicara que fuera a recoger copia certificada de su Informe Financiero de 2002. No obstante, no demostró detalladamente a la CEE el seguimiento que le impartió al trámite para obtener copia certificada de dicho documento ante esa dependencia de gobierno en o antes del 1 de agosto de 2003. No surge de la información que éste le brindara a la CEE que dentro del período del 23 de julio de 2003 al 1 de agosto de 2003 hubiere llamado a la OEG requiriendo le entregaran la copia certificada del documento que estaba expedida desde el 23 de julio de 2003, o que hubiera visitado personalmente dicha agencia o enviado a algún representante debidamente autorizado con tal propósito. El aspirante tampoco demostró detalladamente las gestiones por él realizadas en o antes del 1 de agosto de 2003 para conseguir un Contador Público autorizado para que le preparara un informe financiero revisado al 31 de diciembre de 2002. El aspirante optó por guardar silencio sobre estos asuntos de vital importancia para que la CEE pudiera determinar que éste tenía una excusa razonable o justa causa para su incumplimiento. No cumplió con su deber y obligación de demostrar a la CEE las bases razonables para su incumplimiento. No acreditó a la CEE de ninguna forma que mediara alguna justificación que le permitiera a dicha agencia utilizar su discreción para

extender el término.    La copia certificada del Informe Financiero de 2002 de OEG del aspirante fue expedida el 23 de julio de 2003.  No fue hasta el 7 de agosto de 2003 que el referido documento fue recogido por el aspirante en la sede de la OEG.  No existe excusa razonable o causa justificada para su incumplimiento con el término y requisito dispuesto por ley. Con un mínimo de diligencia el documento pudo haber sido recogido en la OEG y presentado ante la CEE con suficiente anticipación a la fecha y hora límite dispuesta por estatuto.

La CEE ha emitido, en el pasado, a través de otro Presidente, en casos similares al presente, dictámenes que por la naturaleza de sus fundamentos, en que apoyó su decisión, resultan en apariencia inconsistentes con lo actuado y decidido por el actual Presidente de la CEE en el caso ante nos.  Por tal razón pautaríamos la norma aquí sugerida en forma prospectiva por entender que al mediar tal situación y no habiendo norma jurisprudencial clara y precisa en este asunto resultaría injusta su aplicación en forma retroactiva al presente caso.

IV

Por todo  lo antes expuesto concurrimos con el resultado de confirmar la Sentencia recurrida dictada por el Tribunal de Primera Instancia.

Efraín E. Rivera Pérez
Juez Asociado